2015 VT 52











Cincinnati Specialty Underwriters
Insurance Co. v. Energy Wise Homes, Inc., Uhler and Poulos Insurance, Inc. (2014-165)

 

2015 VT 52

 

[Filed 03-Apr-2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 52
 
 


 


 
 
 No. 2014-165
 
 


 


 
 
 Cincinnati Specialty
 Underwriters Insurance Company
 
 
        Supreme Court
 
 
 
 
  
 
 
                                                                                                                                                         
 
 
 
 
 
  
 
 
        On Appeal
 from
 
 
 
 
      v.
 
 
        Superior
 Court, Bennington Unit,
 
 
 
 
  
 
 
        Civil Division
 
 
 
 
  
 
 
  
 
 
 
 
 Energy Wise Homes, Inc., Shirley
 A. Uhler, 
 Michael D. Uhler and Poulos Insurance, Inc.
 
 
 October Term, 2014
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 John
 P. Wesley, J.
 
 
 
 
  
 
 


Shapleigh Smith, Jr. and Sophie E. Zdatny
of Dinse, Knapp & McAndrew, P.C., Burlington, for

  Plaintiff-Appellant.

 

Joel P. Iannuzzi of Cleary Shahi & Aicher, P.C.,
Rutland, and Jennifer Deck Samuelson 

  (On
the Brief) of Samuelson Law Offices, Manchester Center, for
Defendants-Appellees.

 

PRESENT:    Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.), 

                    
Specially Assigned

 

 

¶ 1.            
SKOGLUND, J.   Insurer Cincinnati Specialty
Underwriters Insurance Company appeals from the trial court’s order granting
summary judgment to defendants Energy Wise, Inc. and Michael D. and Shirley A. Uhler in this declaratory-judgment action.  It argues
that the court should have granted summary judgment in its favor because the
“total pollution exclusion” in its policy plainly and unambiguously precludes
coverage in this case.  We agree with insurer, and therefore reverse the
trial court’s decision and remand with instructions to enter judgment in
insurer’s favor.  

¶ 2.            
The facts are undisputed.  Energy Wise is a Vermont corporation
that specializes in insulating buildings and homes.  It purchased a
commercial general liability (CGL) policy from insurer, effective March 1, 2010
to March 1, 2011.  As insurer notes, this was a “surplus lines” policy.[1]  See 8 V.S.A. § 5022(b)(8) (defining “surplus lines insurance” as “coverage not
procurable from admitted insurers”); id. § 5022(b)(1) (defining “admitted insurer” as “an insurer possessing
a certificate of authority to transact business in [Vermont] issued by the
Commissioner [of Financial Regulation] pursuant to [8 V.S.A.
§ 3361]”).  

¶ 3.            
In late 2010, Energy Wise installed spray-foam insulation at the
Shrewsbury Mountain School.  A school employee, Shirley Uhler, and her husband later filed suit against Energy
Wise.  Ms. Uhler asserted that she was “exposed
to and encountered airborne chemicals and airborne residues” from the
spray-foam insulation and suffered bodily injury as a result.[2]  The Uhlers
raised claims of negligence, res ipsa loquitur, and
loss of consortium.  Energy Wise requested coverage under its CGL policy,
and insurer agreed to defend Energy Wise under a bilateral reservation of
rights.  

¶ 4.            
In September 2012, insurer filed a complaint for declaratory judgment,
asserting that its policy did not cover the claims at issue.  Insurer
cited the “Total Pollution Exclusion Endorsement” in its policy, which excluded
coverage for “[b]odily injury
. . . [that] would not have occurred in whole or in part but for
the actual, alleged or threatened discharge, dispersal, seepage, migration,
release or escape of ‘pollutants’ at any time.”  

¶ 5.            
The policy defined “pollutants” as:

any solid, liquid, gaseous, or thermal irritant or
contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals,
petroleum, petroleum products and petroleum by-products, and waste.  Waste
includes materials to be recycled, reconditioned or reclaimed. 
“Pollutants” include but are not limited to, that which has been recognized in
industry or government to be harmful or toxic to persons, property or the
environment, regardless of whether the injury, damage, or contamination is
caused directly or indirectly by the “pollutants” and regardless of whether:
(a) The insured is regularly or otherwise engaged in activities which taint or
degrade the environment; or (b) The insured uses, generates or produces the
“pollutant.”

 

The following specific pollutants
were expressly excluded: respirable dust,
microorganisms, fungi, bacteria, sulfuric acid, tainted drywall, chromated copper aresante,
fluorine, beryllium, benzene, formaldehyde, and manganese.  

¶ 6.            
The policy also excluded coverage for “bodily injury” arising out of
“the installation or application of any exterior insulation and finish system
or any substantially similar system, including the application or use of
conditioners, primers, accessories, flashings, coatings, caulking or sealants
in connection with such system.”  (Quotation marks omitted.)

¶ 7.            
Insurer argued that given the broad language used in the exclusion, and
the fact that the policy included additional exclusions for actual or alleged
bodily injury arising out of or caused by other potential toxins, it was clear
that the policy “d[id] not provide any coverage for bodily injuries related to
toxins, chemicals, or pollutants.”  Thus, insurer argued, the Uhlers’ underlying claim, which was based on exposure to
toxic “airborne chemicals” and “airborne residues,” was not covered.  

¶ 8.            
The Uhlers opposed insurer’s motion for
summary judgment.  They argued that the pollution exclusion was intended
only to protect against liability for traditional environmental hazards, and
that insurer’s interpretation was so overbroad as to make the policy
meaningless.  

¶ 9.            
In a January 2014 decision, the court indicated its intent to grant
summary judgment to defendants.  It recognized that many other courts had
interpreted total pollution exclusions like the one at issue, and it identified
two cases that helped frame the debate: MacKinnon v. Truck Insurance
Exchange, 73 P.3d 1205 (Cal. 2003), and Quadrant Corp. v. American
States Insurance Co., 110 P.3d 733 (Wash. 2005).  California holds
that the total pollution exclusion is limited “to injuries arising from events
commonly thought of as pollution, i.e. environmental pollution,” and it is not
intended to encompass “ordinary acts of negligence involving harmful
substances.”  MacKinnon, 73 P.3d at 1216. 
Washington, on the other hand, holds that the total pollution exclusion, by its
plain language, excludes all injuries that occur from pollutants.  Quadrant
Corp., 110 P.3d at 735.

¶ 10.         After
considering these and other cases, the court found MacKinnon
persuasive.  It concluded that the purpose of the total pollution
exclusion was and remained to protect insurers against traditional
environmental liabilities.  As applied to the facts here, the court found
the term “pollutants” ambiguous because it was capable of such broad
interpretation as to frustrate any reasonable purpose of the policy.  It
found that insurer’s definition admitted to no limiting principle that would
provide a business such as Energy Wise with any assurance that any aspect of
its business operations would be covered.  

¶ 11.         The
court found that a similar ambiguity afflicted insurer’s broad definition of
the term “discharge.”  Energy Wise sprayed insulation into buildings as
the fundamental aspect of its business operations.  It did not spray the
insulation into the air, water, or earth in way that was consistent with
traditional environmental liability.  Under insurer’s argument, the court
reasoned, almost any use of the products of Energy Wise’s business that harmed
a third party might be excluded.  Seen in this light, the court concluded
that the term “discharge” was ambiguous and insurer could not rely on the
exclusion to relieve it of its duty to defend and indemnify Energy Wise.  

¶ 12.         The
court disagreed with the reasoning of the Washington Supreme Court, finding its
resort to plain-language analysis facile.  It concluded that the
Washington decision did not sufficiently account for the historical purpose and
development of the pollution exclusion, or for the reasonable expectations of
an insured business that the pollution exclusion should be subject to a
limiting principle that preserved the meaning and value in a CGL policy. 
The court considered insurer’s argument an “opportunistic afterthought inimical
to the expectations of coverage reasonably associated with the sale of a [CGL]
policy to a company engaged in the business of spraying insulation.”  (Quoting Quadrant Corp., 110 P.3d at 748 (Chambers, J.,
dissenting) (quotation omitted).)

¶ 13.         Thus, given the ambiguities in the policy, and the rule that all
ambiguities must be read in favor of the insured, Vt. Mut.
Ins. Co. v. Parsons Hill P’ship, 2010 VT 44, ¶ 21,
188 Vt. 80, 1 A.3d 1016, the trial court rejected insurer’s argument that
coverage was excluded.  The court indicated that it would enter summary
judgment in defendants’ favor absent a persuasive demonstration that such
relief was unwarranted.  Insurer submitted a response, which the court
found unpersuasive.  This appeal followed.

¶ 14.         Insurer
argues on appeal that its policy plainly bars coverage.  According to
insurer, its policy goes beyond excluding coverage for traditional
environmental risks because its definition of “pollutants” includes “that which
has been recognized in industry or government to be harmful or toxic to persons,
property or the environment.”  (Emphasis added and quotation marks
omitted.)  Insurer asserts that this language broadens the scope of the
pollution exemption beyond traditional environmental claims and distinguishes
this case from the cases relied upon by the trial court.  Insurer
maintains that it is entitled to have the policy enforced as written, that the
reasonable expectations doctrine is irrelevant given the plain language of the
policy, and that enforcement of the exclusion does not render coverage
illusory.  

¶ 15.         We
review the trial court’s decision “de novo, applying the same standard as the
trial court.”  Progressive Cas.
Ins. Co. v. MMG Ins. Co., 2014 VT 70, ¶ 10, __ Vt. __, 103 A.3d 899.
 “Summary judgment is appropriate if the material facts are undisputed and
any party is entitled to judgment as a matter of law.”  Id.; see
also V.R.C.P. 56.  

¶ 16.         We
apply well-established legal principles to this dispute.  An insurance
policy is construed according to “its terms and the evident intent of the
parties as expressed in the policy language.”  Sperling
v. Allstate Indem. Co., 2007 VT
126, ¶ 8, 182 Vt. 521, 944 A.2d 210 (quotation omitted).  We interpret
policy terms “according to their plain, ordinary and popular meaning.”  Id.
(quotation omitted).  Ambiguity exists “[i]f a
term is “subject to more than one reasonable interpretation,” and all
ambiguities “must be resolved in favor of the insured.”  Id.
(quotation omitted).  Policies that “specifically and unambiguously
exclude coverage are effective to preclude the insurer’s liability,” and “we
cannot deny the insurer the benefit of unambiguous provisions inserted into the
policy for its benefit.”  Id. ¶ 14 (quotation
omitted).  While we are mindful of “the reasonable expectations of
the insured in interpreting insurance coverage policy provisions,” “apart from
circumstances where an agent of the insurance carrier promises specific
coverage, we have not held that the expectations of an insured can control over
unambiguous policy language.”  Parsons Hill, 2010
VT 44, ¶ 28.    

¶ 17.         We
begin with the “well-documented and relatively uncontroverted” events that led
to the insurance industry’s adoption of the pollution exclusion.  Am. States Ins. Co. v. Koloms, 687
N.E.2d 72, 79 (Ill. 1997) (quotation omitted).  “Pollution
exclusions originated from insurers’ efforts to avoid sweeping liability for
long-term release of hazardous waste.”  Quadrant, 110 P.3d at 737.  “Prior to 1966, the standard-form CGL
policy provided coverage for bodily injury or property damage caused by an
‘accident.’ ”  Koloms,
687 N.E.2d at 79  (quotation omitted).  The term “accident” was not
defined and courts frequently interpreted the term “to encompass
pollution-related injuries.”  Id.  The insurance industry
changed to an “occurrence”-based policy, but courts continued to construe the
policies “to cover damages resulting from long-term, gradual exposure to
environmental pollution.”  Id. at 79-80.  

¶ 18.         Meanwhile,
changes in federal environmental protection laws and a series of high-profile
environmental disasters “imposed greater economic burdens on insurance
underwriters, particularly those drafting standard-form CGL policies.”  Id. 
Following these events, the insurance industry drafted what eventually became
the pollution exclusion.  Id. at 80.

¶ 19.         In
1970, an endorsement to the standard-form CGL policy provided in relevant part
that:  

[This
policy shall not apply to bodily injury or property damage] arising out of the
discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids,
alkalis, toxic chemicals, liquids or gases, waste materials or other irritants,
contaminants or pollutants into or upon land, the atmosphere or any watercourse
or body of water; but this exclusion does not apply if such discharge,
dispersal, release or escape is sudden and accidental.  

 

Id.
(alteration in original) (quotation omitted).  “[I]n 1973, the
insurance industry incorporated [this] endorsement directly into the body of
the policy as exclusion ‘f.’ ”  Id. 
This exclusion is referred to as the total pollution exclusion. 

¶ 20.         Over
“the next 13 years, various courts labored over the exact meaning of the words
‘sudden and accidental.’ ”  Id.  “Not
surprisingly, insurance companies responded by drafting a new version of the
exclusion, which, first appearing in 1985, is now commonly known as the
‘absolute pollution exclusion.’ ”  Id. at
81.  As one court explained: 

The
two most notable features of this latest version are (i)
the lack of any exception for the “sudden and accidental” release of pollution,
and (ii) the elimination of the requirement that the pollution be discharged
“into or upon land, the atmosphere or any watercourse or body of water.” 
Significantly, the purpose of the current exclusion, like its predecessor, is
“to exclude governmental clean up costs from the
scope of coverage.”  

 

Id. (alteration omitted).

¶ 21.         Many
courts have considered this historical background significant in deciding the
circumstances under which the exclusion should bar coverage.  In Koloms, for example, the court held: 

Our
review of the history of the pollution exclusion amply demonstrates that the
predominate motivation in drafting an exclusion for pollution-related injuries
was the avoidance of the enormous expense and exposure resulting from the
explosion of environmental litigation.  Similarly, the 1986
amendment to the exclusion was wrought, not to broaden the provision’s scope
beyond its original purpose of excluding coverage for environmental pollution,
but rather to remove the sudden and accidental exception to coverage which, as
noted above, resulted in a costly onslaught of litigation.  We would be remiss, therefore, if we were to simply look to the bare
words of the exclusion, ignore its raison d’etre, and
apply it to situations which do not remotely resemble traditional environmental
contamination.  The pollution exclusion has been, and should continue to
be, the appropriate means of avoiding the yawning extent of potential liability
arising from the gradual or repeated discharge of hazardous substances into
the environment.  

 

Id. (citation
and quotations omitted).  The Koloms
court found “it improper to extend the exclusion beyond that arena.”  Id. 
Thus, it held that the accidental release of carbon monoxide due to a broken
furnace did not constitute the type of environmental pollution contemplated by
the exclusion.  Id. at 82.

¶ 22.         Other
courts have found the historical background of this exclusion less
significant.  The Quadrant court held that it could not look to the
drafting history to find the exclusion ambiguous; the drafting history
was relevant only in determining a reasonable construction after the
court had found an ambiguity.  110 P.3d at 738, 742. 
In Quadrant, the insured sought coverage for injuries suffered by a
tenant when fumes from a waterproofing material entered the tenant’s
unit.  The court concluded that the absolute pollution exclusion
“unambiguously applies to the facts of the case at hand,” and that “the plain
language must be applied without reference to extrinsic evidence regarding the
intent of the parties.”  Id. at 735, 742.
 “Where the exclusion specifically includes releases or discharges
occurring on the owner’s property,” the court continued, “or as the result of
materials brought onto the property at the behest of the insured, and a
reasonable person would recognize the offending substance as a pollutant, the
policy is subject to only one reasonable interpretation and the exclusion must
not be limited.”  Id. at 743.  

¶ 23.         As
noted, insurer here argues that its pollution exclusion is even broader than
the “absolute” or “total” pollution exclusion.  At least one court has
credited this argument.  See Cincinnati Ins. Co. v. Becker Warehouse,
Inc., 635 N.W.2d 112, 118-21 (Neb. 2001) (concluding that, where definition
of “pollutant” included substances that were “harmful or toxic to persons,
property or the environment,” the inclusion of “the environment” as a separate
entity that could suffer harm from a pollutant demonstrated that pollution
exclusion’s scope was not limited to environmental pollution); see also Clipper
Mill Fed., LLC v. Cincinnati Ins. Co., No. JFM-10-1647,
2010 WL 4117273, at *7 (D. Md. Oct. 20, 2010) (unpub.)
(reaching similar conclusion).  But cf. Belt
Painting Corp. v. TIG Ins. Co., 795 N.E.2d 15, 20-21 (N.Y. 2003) (rejecting
argument that omission of requirement that pollutants be discharged or
dispersed “into or upon land, the atmosphere or any water course or body of
water” indicated intent to extend exclusion to indoor, as well as outdoor, pollution,
and explaining that omission of such language merely removed redundancy, as
“any pollution will necessarily involve discharge or release into land,
atmosphere or water” and omission of such language did not overcome
environmental implications of terms “discharge, dispersal, seepage, migration,
release or escape”).  

¶ 24.         We
recognize that courts are split on the question of whether the absolute
pollution exclusion bars coverage for all injuries caused by pollutants or
whether the exclusion applies only to injuries caused by traditional
environmental pollution.  Compare Becker Warehouse, 635 N.W.2d at
118 (recognizing split and concluding that “[a] majority of state and federal
jurisdictions have held that absolute pollution exclusions are unambiguous as a
matter of law and, thus, exclude coverage for all claims alleging damage caused
by pollutants” (citing cases)), and Quadrant, 110 P.3d at 738 (finding
that “a majority of courts has concluded that absolute pollution exclusions unambiguously
exclude coverage for damages caused by the release of toxic fumes” (citing
cases)) with MacKinnon, 73 P.3d at 1209 n.2 (concluding that, “[c]onsidering those jurisdictions that have taken a definitive
position, as represented by a published opinion of the state supreme court, the
narrower interpretations of the pollution exclusion appears to be in the
majority” (citing cases)), and Midwest Family Mut.
Ins. Co. v. Wolters, 831 N.W.2d 628, 635, 635 n.2 (Minn. 2013) (concluding
that “a majority of jurisdictions limit the [pollution] exclusion to situations
involving traditional environmental pollution,” although it is a slim majority
(citing cases)).  As the MacKinnon court emphasized, and as is
evident from the case law, “[t]o say that there is a lack of unanimity as to
how the clause should be interpreted is an understatement.”  73 P.3d at
1208; see also Porterfield v. Audubon Indem. Co.,
856 So. 2d 789, 800 (Ala. 2002) (“[T]here exists not just a split of authority,
but an absolute fragmentation of authority.”).  We need not address the
question of whether the “absolute exclusion” set forth above would exclude the
risk at issue here.  

¶ 25.         The
policy here excludes coverage for “[b]odily injury .
. . [that] would not have occurred in whole or in part but for the actual,
alleged or threatened discharge, dispersal, seepage, migration, release or
escape of ‘pollutants’ at any time.”  The term “pollutants” includes
gaseous irritants or contaminants, including chemicals, vapor, and fumes. 
It encompasses “that which has been recognized in industry or government to be
harmful or toxic to persons, property or the environment, regardless of whether
. . . the insured uses, generates or produces the ‘pollutant.’ ”  

¶ 26.         The Uhlers claimed in their complaint that Ms. Uhler suffered bodily injury after being exposed to and
encountering “airborne chemicals and airborne residue.”  They alleged
that, as part of its work at the school, Energy Wise “would be using products
and materials that were known to be severely toxic with significant risk of
injury and/or illness to humans who may be exposed to them.”  There
appears to be no dispute that the airborne chemicals and residues at issue “ha[ve] been recognized in industry
or government to be harmful or toxic to persons, property or the
environment.”  Insurer cites numerous authorities in support of this
contention, and defendants do not argue otherwise.  These toxic chemicals
allegedly became airborne, and were inhaled, as a result of Energy Wise’s
application of spray-foam insulation.  This represents a “dispersal” or
“release” of such chemicals under a common-sense reading of those terms. 
See Becker Warehouse, 635 N.W.2d at 122 (similarly concluding that where
fumes from floor sealant allegedly contaminated food stored in warehouse, “the
only logical explanation for the alleged damage is that the . . . fumes
‘discharged, dispersed, released or escaped’ ” from their original location to
the place where the food was stored).  But see Belt Painting Corp.,
795 N.E.2d at 20 (reaching opposite conclusion, and holding that terms such as
“discharge” and “dispersal” are “terms of art in environmental law used with
reference to damage or injury caused by disposal or containment of hazardous
waste,” and agreeing that “it strains the plain meaning, and obvious intent, of
the language to suggest that . . . fumes, as they went from the container to
[the injured party’s] lungs, had somehow been discharged, dispersed, released
or escaped” (alteration in original) (quotations omitted)).  

¶ 27.         We
recognize that the “broad nature of the pollution exclusion may cause a
commercial client to question the value of portions of its commercial general
liability policy.”  Becker Warehouse, 635 N.W.2d
at 120.  Our role on review, however, is not to rewrite the
policy.  Where, as here, the language used “is clear and susceptible of
only one possible interpretation,” it must be enforced as written.  Id.
at 120-21; see also Sperling, 2007 VT 126, ¶ 14 (stating that,
where policy “specifically and unambiguously exclude[s] coverage,” exclusion is
“effective to preclude the insurer’s liability” (quotation omitted)). 
This interpretation does not render the policy illusory.  As insurer
points out, the policy does provide coverage for other liability risks, such as
slip-and-fall injuries.  See also Quadrant, 110 P.3d at 744
(rejecting argument that pollution exclusion rendered CGL policy illusory,
explaining that although policy excluded from coverage some claims that would
arise out of typical type of work conducted by insured, it did not preclude
coverage for many accidents that could otherwise occur, such as slip-and-fall
injuries).  That the policy does not cover the type of claims that one
might reasonably expect to arise in the course of Energy Wise’s business does
not render the policy unenforceable.  As indicated above, an insured’s
“reasonable expectations” cannot trump “unambiguous policy language.”  Parsons
Hill, 2010 VT 44, ¶ 28; see also Wolters, 831 N.W.2d at 638-39 &
639 n.4  (reaching similar conclusion, and
stating that “[t]he reasonable expectation test is not a license to ignore the
pollution exclusion . . . nor to rewrite the exclusion solely to conform to a
result that the insured might prefer”).    

¶ 28.         Finally,
we note the limited nature of our holding.  As indicated above, the
Vermont Department of Financial Regulation requires all insurers issuing
liability policies in Vermont to provide coverage for pollution by
endorsement unless the Department approves a “Consent to Rate”
application.  Thus, our decision today applies only to surplus lines
insurers.  

Reversed and
remanded.

 


 
 
  
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate
 Justice
 
 


 

 

¶ 29.         MORRIS,
Supr. J. (Ret.), Specially Assigned, dissenting.  
Energy Wise bought a general commercial liability policy for its insulation
business.  As the majority interprets the policy’s pollution exclusion,
Energy Wise essentially purchased nothing.  Under the plain-language
construction adopted by the majority, Energy Wise is not covered for any injury
or damage connected to the compounds used in its insulation business.  The
majority’s construction is not, however, the only reasonable interpretation of
the pollution exclusion.  An insured purchasing this policy could have
reasonably understood the terms “discharge” and “pollutant” in the exclusion as
limited to the mechanisms and substances involved in traditional pollution and
not excluding injury caused by ordinary negligence in the course of
business.  Given that more than one interpretation of the terms is
reasonable, the policy is ambiguous.  I would resolve this ambiguity in
favor of the insured and affirm.    

¶ 30.         As
explained by the majority, the facts are undisputed.  Defendant Energy
Wise is a company that insulates buildings.  It purchased a general
liability policy from plaintiff.  In late fall 2010, Energy Wise
contracted to install spray insulation at a Rutland-area school.  One of
the employees of the school, Shirley Uhler, alleged
she suffered respiratory illness and other medical injuries as a result of the
spray insulation.  Shirley and her husband Michael sued Energy Wise,
claiming that she was exposed to chemicals and airborne residue from the
application.  She asserted, among other things, that Energy Wise failed to
exercise due care and perform in a workmanlike manner.  Insurer filed this
suit seeking a declaration that it has no duty to defend or indemnify defendant
Energy Wise in the personal-injury suit.  

¶ 31.         Insurer
filed for summary judgment, claiming that under the plain language of the
policy’s “Total Pollution Exclusion” the alleged injury was excluded because
the policy did not provide “any coverage for bodily injuries related to
toxins, chemicals, or pollutants.”  The court concluded that the language
of the exclusion was ambiguous because the terms pollutant and discharge were
capable of such broad interpretations as to render them meaningless.  The
court further noted that the purpose of the pollution exclusion was to protect
against traditional environmental liabilities, and not ordinary
negligence.  The court resolved the ambiguity in favor of the insured,
denied insurer summary judgment, and granted judgment for insured.

¶ 32.         The
trial court properly determined that the policy in this case is ambiguous
because the policy terms do not have a clear meaning.  Insurer has not met
its burden of demonstrating that the claims fall within the exclusion for two
main reasons.  First, it is not evident that the process that caused the
injury in this case—spraying foam insulation into a building—resulted from one
of the actions identified in the policy exclusion—discharge, dispersal,
seepage, migration, release or escape—or that this action was the “but-for”
cause of the injury.  Second, there is insufficient evidence to show that
the injury was caused by a pollutant, or that pollutant as used in the policy
covers the work performed by Energy Wise.

¶ 33.         The
legal framework is important.  Insurer sought a declaration here that it
was not obligated to indemnify or defend insured.  The duty to indemnify
arises when there is a loss or injury that falls within the coverage provisions
and is not removed from coverage by an exclusion. 
Coop. Ins. Cos. v. Woodward, 2012 VT 22, ¶ 11, 191 Vt. 348, 45 A.3d 89.  The duty to defend is broader than the
duty to indemnify.  City of Burlington v. Nat’l Union
Fire Ins. Co., 163 Vt. 124, 127, 655 A.2d 719, 721 (1994).  To
determine if the duty to defend arises, the allegations in the complaint are
compared to the terms of coverage in the policy.  Id.  “If any
claims are potentially covered by the policy, the insurer has a duty to
defend.”  Id.

¶ 34.         To
determine the scope of coverage, the insurance contract is interpreted using
familiar standards.  An insurance contract is construed first by looking
to the terms used and “ ‘the evident intent of
the parties as expressed in the policy language.’ ” 
N. Sec. Ins. Co. v. Perron, 172
Vt. 204, 209, 777 A.2d 151, 154 (2001) (quoting Nat’l Union Fire Ins. Co.,
163 Vt. at 127-28, 655 A.2d at 721).  The terms of a contract are given
their “plain, ordinary and popular meanings.”  Waters
v. Concord Grp. Ins. Cos., 169 Vt. 534, 536, 725 A.2d 923, 926 (1999)
(mem.).  An ambiguity in the policy arises when “a writing in and
of itself supports a different interpretation from that which appears when it
is read in light of the surrounding circumstances, and both interpretations are
reasonable.”  Id. at 537, 725 A.2d at 927
(quotation omitted).  The overall “guiding principle” in
interpreting an insurance contract is to consider “what a reasonably prudent
person applying for insurance coverage would have understood [the terms of the
contract] to mean.  Coop. Ins. Cos., 2012 VT 22,
¶ 9 (quotation omitted).  

¶ 35.         Therefore,
the language of the policy itself is the starting point for determining whether
coverage exists.  This was a commercial general liability policy for the
business described therein as “insulation contractors.”  The policy
covered bodily injury and property damage caused by an occurrence.  It is
clear that in the absence of an exclusion the injury
alleged by plaintiffs would have been covered under this policy.  

¶ 36.         Thus,
the main question is whether an exclusion from coverage applies.  “The
insurer bears the burden of showing that the claims are excluded by the
policy.”  Perron, 172 Vt. at 209, 777 A.2d at 154.  Here, insurer relies on the policy
exclusion entitled “Total Pollution Exclusion Endorsement.”  The exclusion
exempts coverage for bodily injury and property damage “which would not have
occurred in whole or part but for the actual, alleged or threatened discharge,
dispersal, seepage, migration, release or escape of ‘pollutants’ at any
time.”  Pollutant is defined separately as:

any solid, liquid, gaseous or thermal irritant or
contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum,
petroleum products and petroleum by-products, and waste.  Waste includes
materials to be recycled, reconditioned or reclaimed.  “Pollutants”
include but are not limited to, that which has been recognized in industry or
government to be harmful or toxic to persons, property or the environment,
regardless of whether the injury, damage, or contamination is caused directly
or indirectly by the “pollutants” and regardless of whether: (a) The insured is
regularly or otherwise engaged in activities which taint or degrade the
environment; or (b) The insured uses, generates or produces the
“pollutant.”  

 

Thus, insurer bore the burden of
proving both that the airborne compounds and particulates from the spray-foam
insulation were pollutants when deployed to insulate the building,
and that the injury would not have occurred but for the discharge, dispersal,
seepage, migration, release or escape of those compounds.  

¶ 37.         Of
course, this question does not reach this Court in a vacuum.  As the
majority recounts, pollution exclusions have been the subject of intense
litigation for many years, and there is no consensus on the proper
interpretation of these clauses.  See MacKinnon v. Truck Ins. Exch.,
73 P.3d 1205, 1208 (Cal. 2003) (“To say there is a lack of unanimity as to how
the clause should be interpreted is an understatement.”).  Some of the
difference in outcomes is due to variations in fact patterns and some to
changes in the language of the pollution exclusion as it has evolved over the years. 
It began as a qualified exclusion for the “sudden and accidental” release of
pollutants.  See Pa. Nat’l Mut. Ins. Co. v.
City of Pittsburg, 987 F.2d 1516, 1518-19 (10th Cir. 1993) (analyzing
whether injury resulted from “sudden and accidental” discharge).  The next
version, referred to as the absolute pollution exclusion, eliminated the
“sudden and accidental” language and the requirement that the pollutant be
discharged into the land, atmosphere or water.  MacKinnon, 73 P.3d
at 1209-10 (describing history of pollution exclusion).  The third
generation, and the one at issue here, is referred to as the total pollution
exclusion, and excludes coverage for damage that “would not have occurred in
whole or in part but for the actual, alleged or threatened discharge,
dispersal, seepage, migration, release or escape of ‘pollutants’ at any
time.”  (Emphasis added.)  

¶ 38.         Several
courts have concluded that these exclusions, including the total pollution
exclusion, are ambiguous and do not exclude coverage for all injuries related
to toxic substances.  See, e.g., Builders Mut. Ins. Co. v. Parallel Design & Dev.
LLC, 785 F. Supp. 2d 535, 547-48 (E.D. Va. 2011) (concluding total
pollution exclusion ambiguous); Kerr-McGee Corp. v. Ga. Cas.
& Sur. Co., 568 S.E.2d 484, 487 (Ga. Ct. App. 2002) (same). 
Such determinations generally focus on three things.  First, the terms
“discharge, dispersal, release or escape” all imply “expulsion of the pollutant
over a considerable area rather than a localized toxic accident occurring in
the vicinity of intended use.”  MacKinnon, 73 P.3d at 1211; see 9
S. Plitt et al., Couch on Insurance § 127:9 (3d ed.
2014) (citing cases holding that exclusion “does not apply if the facts show
that the discharge, dispersal, release, or escape was a localized toxic
accident occurring within the vicinity of the pollutant’s intended use”). 
Second, the word pollutant when defined as a contaminant or irritant is overly
broad and therefore ambiguous.  MacKinnon, 73
P.3d at 1211.  Third, the history of the exclusion reveals that it
was intended to remove coverage for traditional environmental contamination,
and not for ordinary negligence.  Id. at 1211-12.

¶ 39.         Other
jurisdictions have read the language of the pollution exclusion to unambiguously
exclude coverage.  See, e.g., Quadrant Corp. v. Am. States Ins. Co.,
110 P.3d 733, 741 (Wash. 2005) (concluding that policy language clearly
excluded coverage for injury suffered by tenant caused by fumes from
waterproofing material).  The majority takes this approach, concluding
that the exclusion here unambiguously bars coverage because the injury resulted
from exposure to a chemical and those chemicals were airborne.  As
explained more fully below, this conclusion oversimplifies the situation. 
A reasonably intelligent layperson viewing the language in light of the usual
and natural meaning of the words and the existing circumstances could
justifiably read the exclusion in this case as limiting coverage for harm
caused by traditional environmental pollution, and not excluding coverage for
injuries arising from ordinary negligence while using a product for its
intended purpose.  As applied to the facts here, the insurer has failed to
demonstrate that the exclusion applies because it fails to show that the injury
was caused by a pollutant and that the injury would not have occurred but for
the discharge of that pollutant.

I.
Discharge

¶ 40.         Looking
first to the mechanism of injury, it is totally unclear that the injury here
was due to a discharge, dispersal, seepage, migration, release or escape of a
substance.  Insurer gives little argument on this point, stating simply in
a footnote that there is no dispute that the chemicals and residue at issue
here were dispersed, released or escaped into the air.  The majority also
provides only limited consideration of this question, stating simply that when
Energy Wise applied the spray insulation, toxic chemicals became airborne and
were therefore dispersed or released “under a common-sense reading of those
terms.”  Ante, ¶ 26.  

¶ 41.         While
one reasonable interpretation of the policy is that it includes any injury that
arises when a substance becomes airborne, that is certainly not the only
interpretation.  It is important to emphasize that “ambiguity is not what
the insurer intended its words to mean but what a reasonably prudent person
applying for insurance would have understood them to mean.”  2 S. Plitt, supra, § 21:14. 
It is wholly reasonable for an ordinary person seeking coverage to interpret
the terms “discharge, dispersal, release or escape” as environmental terms of
art and referring to mechanism by which pollution escapes from a contained
space into the surrounding area.  See Mistick,
Inc. v. Nw. Nat’l Cas. Co., 2002 PA
Super 267, ¶¶ 9-10, 806 A.2d 39 (explaining that “dispersal” is ambiguous
because it connotes environmental context of gradual movement). 
Further, it is reasonable to conclude that these terms do not apply to injuries
resulting from exposure to an airborne irritant in the area of its intended
use.  Belt Painting Corp. v. TIG Ins. Co., 795 N.E.2d 15, 20 (N.Y.
2003) (concluding that terms “discharge” and “dispersal” in total pollution
exclusion were ambiguous and did “not clearly and unequivocally exclude a
personal injury claim arising from indoor exposure to plaintiff insured’s tools
of its trade”).  

¶ 42.         Particularly
where insurance is for a business involving the regular use of chemical
compounds, an exclusion referring to “discharge, dispersal, seepage, migration,
release or escape” is ambiguous because it does not clearly define at what
point the deployment of the chemical compound triggers the exclusion.  As
another court stated in finding this phrase ambiguous:

Industrial
chemicals when used as intended and released from a container may be used in a
production process to etch, to strip, to clean, to degrease, to polish, to act
as a solvent, to paint, to coat, to act as a mastic, or to surface.  At
what point in time does a “discharge, dispersal, seepage, migration, release or
escape” of industrial chemicals outside a container or containment system
occur?  How would containment be defined, i.e., used as intended outside a
container, contained within the plant, or merely outside
its container?  For example, carbon tetrachloride, reported in many cases
of maintenance slip and fall cases as a common industrial solvent/degreaser,
when used on the floor of a restaurant or fast food business to remove food
spills, would come within [insurer’s] overly broad exclusion language if it
caused someone to slip and fall.  This definition of the escape of
pollutants is overly broad and demonstrates ambiguity that would cause a
reasonable person to be unsure of what is excluded and what is covered by
insurance.

 

Kerr-McGee Corp., 568 S.E.2d at 459.  Given that there is no allegation
in this case that the spray-foam insulation traveled outside of the area of its
intended use, there is an ambiguity as to whether there was a “discharge,
dispersal, seepage, migration, release or escape” of this substance.

¶ 43.         A
similar conclusion was reached by the U.S. Court of Appeals for the Sixth
Circuit in a case involving a painting company that was hired to perform
construction work, including painting and drywall sealing in a school.  Meridian Mut. Ins. Co.
v. Kellman, 197 F.3d 1178 (6th Cir. 1999)
(applying Michigan law).  A teacher alleged that fumes from the chemicals
in a floor sealant caused respiratory injuries.  The insurer denied
coverage under a pollution exclusion.  The court
concluded that the exclusion did not apply because the alleged injury was
confined to the general area of the intended use and therefore the injury was
not caused by the “discharge, dispersal, seepage, migration, release or escape
of pollutants.”  Id. at 1184-85 (quotation marks
omitted).  The court explained that the policy language did not
“clearly and unambiguously exclude coverage for such injuries.”  Id. at 1185.  The same is true here.  The
policy terms “discharge, dispersal, seepage, migration, release or escape” do not unambiguously apply to the release of
substances confined to the general area of their intended use.  See Roofers’
Joint Training, Apprentice & Educ. Comm. of W. N.Y. v. Gen. Accident Ins.
Co. of Am., 713 N.Y.S.2d 615, 617 (App. Div. 2000) (holding that there was
no discharge, dispersal, release, or escape of pollutants where fumes that
caused injury were part of normal roofing process and confined to area of
intended use).

¶ 44.         Further,
insurer has failed to demonstrate that the even if there was a discharge, this
discharge was the “but-for” cause of the injury.  The complaint alleges
that the school employee was injured when she inhaled chemicals or particles
used in the insulation process.  Employee asserts that her exposure was
the result of Energy Wise’s negligence in failing to perform in a workmanlike
manner and to properly warn or secure the site.  In other words, the
chemicals were not the cause of injury; rather, the “but-for” cause of the
injury was the negligence of employees in failing either to properly secure or
ventilate their work area or warn employees as to when the space was ready for
occupancy.  See Barrett v. Nat’l Union Fire Ins. Co. of Pittsburgh,
696 S.E.2d 326, 332 (Ga. Ct. App. 2010) (concluding that pollution exclusion
did not apply because allegations were that negligence of employees caused
injury and not release of gas in itself).  As the dissenting judge in Quadrant
explained, “The mere fact that a pollutant was involved in the causal chain of
events does not trigger the pollution exclusion.”  Quadrant
Corp., 110 P.3d at 745 (Chambers, J., dissenting).  Because the
exclusion can be reasonably read to apply only to injuries caused by a
polluting event, it is ambiguous.

II.  Pollutant

¶ 45.         To
meet its burden, insurer was also required to first show that the injury was
caused by a pollutant.  Insurer has failed to meet this burden.  The
undisputed facts as presented to the trial court at summary judgment do not
show that the chemicals or residues, which allegedly caused the injury,
unambiguously meet the policy definition of pollutant.  Further, the
definition of pollutant in the policy is so broad as to make it
ambiguous.  

¶ 46.         Here,
the policy definition of pollutant includes irritants and contaminants that
have been recognized by industry and government as harmful or toxic. 
Insurer posits that the spray-foam insulation alleged to have caused the injury
is recognized by government as potentially hazardous, and therefore posits that
the injury was unambiguously caused by a pollutant.  The majority accepts
insurer’s position and concludes that the alleged injury was caused by the
release of a pollutant because the airborne chemicals at issue “ ‘ha[ve] been recognized in
industry or government to be harmful or toxic to persons, property or the
environment.’ ”  Ante, ¶ 26 (quoting
policy definition of pollutant).  

¶ 47.         There
is no evidence in the record to show that the chemicals or residues that caused
the injury alleged are recognized by government as harmful or toxic.  The
complaint in the personal-injury action does not identify the chemicals or
residues that caused Ms. Uhler’s injury. 
Insurer’s statement of undisputed facts in support of summary judgment did not
attempt to set forth what particular compounds caused the injury.  On
appeal, insurer urges this Court to take judicial notice of the fact that
spray-foam insulation has been recognized as harmful or toxic, and in support
attaches an appendix of materials that was not part of the trial court
record.  Insurer specifically proffers that methylene diphenyl
diisocyanate (MDI) is a compound found in spray-foam
insulation and is identified by government as toxic because it is included by
the Environmental Protection Agency (EPA) on its list of hazardous air
pollutants.  See 42 U.S.C. § 7412(b)(1). 
The majority does not specify what chemicals caused the injury or what industry
or government standard it is relying upon, but simply repeats that the
compounds at issue are recognized by government as toxic.  

¶ 48.         Insurer
failed to demonstrate that the injury here was caused by a chemical that
government or industry regards as toxic.  The information submitted on
appeal in support of this claim should be disregarded as not part of the
record.  See V.R.A.P. 10(a)(1) (defining record
on appeal as documents filed in superior court).  Further, even if this
Court took judicial notice of these documents, MDI, on which insurer relies, is
not identified as a component of the insulation used in this case or as a cause
of the injury.  The deposition submitted by insurer to the trial court in
support of its motion to reconsider explains that spray-foam insulation can
vary in its composition, and does not specify the composition of the insulation
used here.  In addition, to the extent that this Court accepts that MDI is
a pollutant and a component of spray-foam insulation, the Uhlers
did not allege that this was the source of the injury.  In their
opposition to summary judgment, the Uhlers stated
that the injury was due to exposure to tertiary amine catalysts, and submitted
an expert affidavit in support.  Insurer has not demonstrated this
compound is a pollutant.  Since insurer has failed to unambiguously
demonstrate that the injury alleged was caused by a pollutant, this Court
should require insurer to defend.  City of Burlington,
163 Vt. at 127, 655 A.2d at 721 (explaining that duty to defend arises if any
claims potentially covered).

¶ 49.         Even
assuming that a compound in the insulation used by Energy Wise caused the
injury and that the compound is on the EPA list of hazardous air pollutants,
these facts alone do not make it a pollutant under the policy in all
circumstances.  This may be a reasonable interpretation, but it is not the
only one.  To assume that all listed chemical compounds are pollutants in
all situations would result in overly inclusive and absurd situations since
many of the compounds on the list of hazardous air pollutants have legitimate
uses.  For example, the EPA list identified by insurer includes chlorine,
42 U.S.C. § 7412(b)(1), a chemical used to
disinfect drinking water, and found in tap water.  If inclusion on the EPA
list is enough to trigger the exclusion then any damage resulting from
chlorine-treated water could be excluded.  See Pipefitters Welfare
Educ. Fund v. Westchester Fire Ins., 976 F.2d 1037, 1043 (7th Cir. 1992)
(explaining that terms “irritant” and “contaminant” if read broadly would
exclude coverage “for bodily injuries suffered by one who slips and falls on
the spilled contents of a bottle of Drano, and for bodily injury caused by an
allergic reaction to chlorine in a public pool” because both Drano and chlorine
are irritants that can cause bodily injury).  This is certainly not the
only interpretation a reasonably prudent person applying for insurance coverage
would have understood the terms of the contract to mean.  See Coop.
Ins. Cos., 2012 VT 22, ¶ 9.    

¶ 50.         Insurer
places great emphasis on the fact the definition of pollutant in this case
differs from that used in other cases finding the language ambiguous, such as MacKinnon,
73 P.3d 1205.  The definition of the policy here states that pollutants
are not limited to substances that are generally recognized by industry or
government to be harmful or toxic to persons, property or the environment, and
insurer argues that this shows that that the definition is intended to include
contaminants that harm persons but not the environment.  In other words,
it unambiguously applies to injuries from toxic substances outside of
traditional pollution.  Other courts interpreting the same definition of
pollutant have accepted this argument, concluding that it expands pollutant
beyond traditional environmental pollutants.  See Clipper Mill Fed.,
LLC v. Cincinnati Ins. Co., No. JFM–10–1647, 2010 WL 4117273, at *7 (D. Md.
Oct. 20, 2010) (concluding that definition of pollutant using phrase “harmful
or toxic to persons, property or the environment” demonstrated intent to
include irritants and contaminants that harm persons but not environment, and
expand scope beyond environmental pollution).  

¶ 51.         I
cannot agree with the majority that this different language of pollutant makes
the definition of pollutant unambiguous.  The definition remains
incredibly broad, applying to almost any injury involving a substance that
could be harmful.  The overly simplistic interpretation of the pollution
exclusion applied by the majority means that it excludes coverage for ordinary
negligence involving substances with toxicity.  If so interpreted, then
the exclusion has the potential to wholly eviscerate coverage.  See Century
Sur. Co. v. Casino W., Inc., 329 P.3d 614, 617 (Nev. 2014) (stating that definition
of pollutant broad enough to include “items such as soap, shampoo, rubbing
alcohol, and bleach” and therefore preclude coverage from accident caused by
slipping on puddle of bleach or developing rash from soap).  As Judge
Posner explained: 

The terms
“irritant” and “contaminant,” when viewed in isolation, are virtually
boundless, for there is virtually no substance or chemical in existence that
would not irritate or damage some person or property.  Without some
limiting principle, the pollution exclusion clause would extend far beyond its
intended scope, and lead to some absurd results.

 

Pipefitters
Welfare Educ. Fund, 976 F.2d at 1043 (quotation omitted).

¶ 52.         To
apply the construction used by the majority would essentially eviscerate coverage
for almost all imaginable injuries.  Insurer counters, and the majority
accepts, that the policy is not rendered illusory because it still provides
coverage for risks such as slip-and-fall injuries.  It is hard to imagine
a scenario for this insured’s business, however, that does not involve the
dispersal of pollutants as the majority and insurer defined those terms. 
What if an employee tripped while discharging the spray-foam insulation? 
Under the majority’s plain-language interpretation of pollutant and dispersal,
any resulting injuries would be excluded.  This is certainly not what a
reasonable prospective insured would assume from reading the policy terms.

¶ 53.         Ambiguity
is also apparent when the definition of pollutant is viewed in the context of
the policy as a whole.  See McAlister v. Vt. Prop. & Cas. Ins. Guar. Ass’n, 2006 VT 85, ¶ 17, 180 Vt. 203, 908 A.2d 455
(explaining that policy provisions should be construed as whole and policy
viewed “in its entirety”).  The policy contains individual exclusions for
bodily injury and damage resulting from exposure to respirable
dust, asbestos, lead, sulfuric gas, tainted drywall, chromated
copper arsenate products, fluorine, beryllium, benzene, formaldehyde, and
manganese.  If the definition of pollutant is indeed as broad as insurer
asserts, these additional exclusions and lists would be redundant because they
would already fall within the pollution exclusion.  See Builders Mut. Ins. Co., 785 F. Supp. 2d at 547-48 (concluding
definition of pollutant ambiguous in part due to terms of policy as
whole).  Therefore, given the lack of limiting language on the word
pollutant and the inconsistencies that result with other provisions in the
policy, I would conclude that pollutant as used in the exclusion is ambiguous.

III.
Resolving the Ambiguity

¶ 54.         Generally,
when an ambiguity arises, it is resolved by construing the policy in light of
the parties’ reasonable expectations, and any uncertainty is resolved in favor
of the insured.[3] 
Waters, 169 Vt. at 537, 725 A.2d at 927. 
The reasonable expectations of the parties are important in considering the
scope of insurance coverage “because such contracts, largely adhesive in
nature, often contain boilerplate terms that are not bargained for, not read,
and not understood by the insureds.”  State Farm Mut. Auto. Ins. Co. v.
Roberts, 166 Vt. 452,
461, 697 A.2d 667, 672 (1997).  

¶ 55.         The
purpose of this policy was to provide general liability insurance to Energy
Wise for the insulation business.  Undoubtedly, Energy Wise specifically
contemplated that it would be insured for using spray-foam insulation since
this is its business.  See Keggi v.
Northbrook Prop. & Cas.
Ins. Co., 13 P.3d 785 (Ariz. Ct. App. 2000) (explaining that insured who
purchases general liability policy “expects to be covered for ordinary
negligence in the course of its operations”).  Given Energy Wise’s
reasonable expectation that it was purchasing a general liability policy, and the
identified ambiguities in the policy, I would construe the policy in the
insured’s favor and affirm the trial court.


 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Superior Judge (Ret.),
 Specially Assigned
 
 


 

 






































[1] 
Vermont law provides that insurance coverage “shall not be placed with a
non-admitted insurer unless the full amount of insurance required is not
reasonably procurable from admitted insurers actually transacting that kind and
class of insurance in [Vermont]; and the amount of insurance exported shall be
only the excess over the amount procurable from admitted insurers actually
transacting and insuring that kind and class of insurance.”  8 V.S.A. §
5024(a); see also DeBartolo v. Underwriter’s at Lloyd’s of London, 2007
VT 31, ¶ 3, 181 Vt. 609, 925 A.2d 1018 (mem.) (recognizing
that a surplus lines insurer “can issue coverage only if it is not reasonably
available from other sources”).  According to insurer, the terms of a
surplus lines policy are not subject to approval by the State of Vermont,
citing 8 V.S.A. § 5021 et seq.  Defendants do not argue otherwise.  

 

This is significant because the Vermont Department of
Financial Regulation requires all insurers issuing liability policies in
Vermont to provide coverage for pollution by endorsement, although the
Department will consider a “Consent to Rate” application “from licensed
insurance companies or their agents seeking to attach a pollution exclusion to
liability coverage when there is a high probability of a pollution
claim.”  See Insurance Bulletin No. 111 (Oct. 18, 1996), available at
http://www.dfr.vermont.gov/reg-bul-ord/pollution-coverage.  

 

Vermont regulators have disapproved of such exclusions
since their inception based on a “determination that the exclusions were
‘unfair and discriminatory to some[,] and indeed most[,]
risk’ and inconsistent with the ‘public expectation of the level of coverage or
the degree of coverage that is supposed to be available when one purchased a
general liability policy. . . .  That practice continues today,
although VDBI [(now DFR)] now has a mechanism for approving pollution
exclusions on a risk-by-risk basis in cases where, for example, the insured’s
operations involve a particularly high risk of environmental liability and the
insured would otherwise be unable to obtain coverage.”  Maska
U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 80 (2d Cir. 1999)
(alteration omitted).

 





[2] 
While the Uhlers’ complaint did not specifically
identify the airborne substance allegedly responsible for Ms. Uhler’s injury, the Uhlers’
expert opined that it was most likely tertiary amine catalysts.  





[3] 
Here, the trial court denied summary judgment for the insurer, and entered
judgment for the insured.  I would affirm that decision.  At the very
least, however, this Court should remand for a factual inquiry into the proper
scope of the exclusion “based on the common usages and understandings of the
insurance industry, and the purposes of the exclusion in conjunction with the hazards
and risks [insurer’s] policy was designed to protect against.”  Red Panther Chem. Co. v. Ins. Co. of Pa., 43 F.3d 514, 519
(10th Cir. 1994) (concluding total pollution exclusion ambiguous and remanding
for inquiry into scope of policy exclusion).