2015 VT 52
 

 


 








Cincinnati Specialty Underwriters
Insurance Co. v. Energy Wise Homes, Inc., Uhler and Poulos Insurance, Inc. (2014-165)


 


2015 VT 52


 


[Filed 03-Apr-2015]


 


 


NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions by email at:
JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State
Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections
may be made before this opinion goes to press.


 


 




 
 

 
 
 2015 VT 52

 

 

 



 




 
 

 
 
 No. 2014-165

 

 

 



 




 
 

 
 
 Cincinnati Specialty
 Underwriters Insurance Company

 

 
 
 Supreme Court

 

 

 

 
 
  

 

 
 
                                                                                                                                                         


 

 

 

 
 
  

 

 
 
 On Appeal from

 

 

 

 
 
      v.

 

 
 
 Superior Court, Bennington
 Unit,

 

 

 

 
 
  

 

 
 
 Civil Division

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
 Energy Wise Homes, Inc., Shirley
 A. Uhler, 

 
 Michael D. Uhler and Poulos Insurance, Inc.

 

 
 
 October Term, 2014

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
 John
 P. Wesley, J.

 

 

 

 
 
  

 

 

 



Shapleigh Smith, Jr. and Sophie E. Zdatny
of Dinse, Knapp & McAndrew, P.C., Burlington, for


  Plaintiff-Appellant.


 


Joel P. Iannuzzi of Cleary Shahi & Aicher, P.C.,
Rutland, and Jennifer Deck Samuelson 


  (On the Brief) of
Samuelson Law Offices, Manchester Center, for Defendants-Appellees.


 


PRESENT:  Dooley, Skoglund
and Robinson, JJ., and Morris, Supr. J. (Ret.), 


                    
Specially Assigned


 


 


¶ 1.            
SKOGLUND, J.   Insurer Cincinnati Specialty
Underwriters Insurance Company appeals from the trial court’s order granting
summary judgment to defendants Energy Wise, Inc. and Michael D. and Shirley A. Uhler in this declaratory-judgment action.  It argues
that the court should have granted summary judgment in its favor because the
“total pollution exclusion” in its policy plainly and unambiguously precludes
coverage in this case.  We agree with insurer, and therefore reverse the
trial court’s decision and remand with instructions to enter judgment in
insurer’s favor.  


¶ 2.            
The facts are undisputed.  Energy Wise is a Vermont corporation
that specializes in insulating buildings and homes.  It purchased a
commercial general liability (CGL) policy from insurer, effective March 1, 2010
to March 1, 2011.  As insurer notes, this was a “surplus lines” policy.[1]  See 8 V.S.A. § 5022(b)(8)
(defining “surplus lines insurance” as “coverage not procurable from admitted
insurers”); id. § 5022(b)(1) (defining “admitted insurer” as
“an insurer possessing a certificate of authority to transact business in
[Vermont] issued by the Commissioner [of Financial Regulation] pursuant to [8
V.S.A. § 3361]”).  


¶ 3.            
In late 2010, Energy Wise installed spray-foam insulation at the
Shrewsbury Mountain School.  A school employee, Shirley Uhler, and her husband later filed suit against Energy
Wise.  Ms. Uhler asserted that she was “exposed
to and encountered airborne chemicals and airborne residues” from the
spray-foam insulation and suffered bodily injury as a result.[2]  The Uhlers
raised claims of negligence, res ipsa loquitur, and
loss of consortium.  Energy Wise requested coverage under its CGL policy,
and insurer agreed to defend Energy Wise under a bilateral reservation of
rights.  


¶ 4.            
In September 2012, insurer filed a complaint for declaratory judgment,
asserting that its policy did not cover the claims at issue.  Insurer
cited the “Total Pollution Exclusion Endorsement” in its policy, which excluded
coverage for “[b]odily injury
. . . [that] would not have occurred in whole or in part but for
the actual, alleged or threatened discharge, dispersal, seepage, migration,
release or escape of ‘pollutants’ at any time.”  


¶ 5.            
The policy defined “pollutants” as:


any
solid, liquid, gaseous, or thermal irritant or contaminant, including smoke,
vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products
and petroleum by-products, and waste.  Waste includes materials to be
recycled, reconditioned or reclaimed.  “Pollutants” include but are not
limited to, that which has been recognized in industry or government to be
harmful or toxic to persons, property or the environment, regardless of whether
the injury, damage, or contamination is caused directly or indirectly by the
“pollutants” and regardless of whether: (a) The insured is regularly or
otherwise engaged in activities which taint or degrade the environment; or (b)
The insured uses, generates or produces the “pollutant.”


 


The following specific pollutants
were expressly excluded: respirable dust,
microorganisms, fungi, bacteria, sulfuric acid, tainted drywall, chromated copper aresante, fluorine,
beryllium, benzene, formaldehyde, and manganese.  


¶ 6.            
The policy also excluded coverage for “bodily injury” arising out of
“the installation or application of any exterior insulation and finish system
or any substantially similar system, including the application or use of
conditioners, primers, accessories, flashings, coatings, caulking or sealants
in connection with such system.”  (Quotation marks omitted.)


¶ 7.            
Insurer argued that given the broad language used in the exclusion, and
the fact that the policy included additional exclusions for actual or alleged
bodily injury arising out of or caused by other potential toxins, it was clear
that the policy “d[id] not provide any coverage for bodily injuries related to
toxins, chemicals, or pollutants.”  Thus, insurer argued, the Uhlers’ underlying claim, which was based on exposure to
toxic “airborne chemicals” and “airborne residues,” was not covered.  


¶ 8.            
The Uhlers opposed insurer’s motion for
summary judgment.  They argued that the pollution exclusion was intended
only to protect against liability for traditional environmental hazards, and
that insurer’s interpretation was so overbroad as to make the policy
meaningless.  


¶ 9.            
In a January 2014 decision, the court indicated its intent to grant
summary judgment to defendants.  It recognized that many other courts had
interpreted total pollution exclusions like the one at issue, and it identified
two cases that helped frame the debate: MacKinnon v. Truck Insurance
Exchange, 73 P.3d 1205 (Cal. 2003), and Quadrant Corp. v. American
States Insurance Co., 110 P.3d 733 (Wash. 2005).  California holds
that the total pollution exclusion is limited “to injuries arising from events
commonly thought of as pollution, i.e. environmental pollution,” and it is not
intended to encompass “ordinary acts of negligence involving harmful
substances.”  MacKinnon, 73 P.3d at 1216.  Washington, on the
other hand, holds that the total pollution exclusion, by its plain language,
excludes all injuries that occur from pollutants.  Quadrant Corp.,
110 P.3d at 735.


¶ 10.        
After considering these and other cases, the court found MacKinnon
persuasive.  It concluded that the purpose of the total pollution
exclusion was and remained to protect insurers against traditional
environmental liabilities.  As applied to the facts here, the court found
the term “pollutants” ambiguous because it was capable of such broad
interpretation as to frustrate any reasonable purpose of the policy.  It
found that insurer’s definition admitted to no limiting principle that would
provide a business such as Energy Wise with any assurance that any aspect of
its business operations would be covered.  


¶ 11.        
The court found that a similar ambiguity afflicted insurer’s broad
definition of the term “discharge.”  Energy Wise sprayed insulation into
buildings as the fundamental aspect of its business operations.  It did
not spray the insulation into the air, water, or earth in way that was
consistent with traditional environmental liability.  Under insurer’s
argument, the court reasoned, almost any use of the products of Energy Wise’s
business that harmed a third party might be excluded.  Seen in this light,
the court concluded that the term “discharge” was ambiguous and insurer could
not rely on the exclusion to relieve it of its duty to defend and indemnify
Energy Wise.  


¶ 12.        
The court disagreed with the reasoning of the Washington Supreme Court,
finding its resort to plain-language analysis facile.  It concluded that
the Washington decision did not sufficiently account for the historical purpose
and development of the pollution exclusion, or for the reasonable expectations
of an insured business that the pollution exclusion should be subject to a
limiting principle that preserved the meaning and value in a CGL policy. 
The court considered insurer’s argument an “opportunistic afterthought inimical
to the expectations of coverage reasonably associated with the sale of a [CGL]
policy to a company engaged in the business of spraying insulation.” 
(Quoting Quadrant Corp., 110 P.3d at 748 (Chambers, J., dissenting)
(quotation omitted).)


¶ 13.        
Thus, given the ambiguities in the policy, and the rule that all
ambiguities must be read in favor of the insured, Vt. Mut.
Ins. Co. v. Parsons Hill P’ship, 2010 VT 44, ¶
21, 188 Vt. 80, 1 A.3d 1016, the trial court rejected insurer’s argument that
coverage was excluded.  The court indicated that it would enter summary
judgment in defendants’ favor absent a persuasive demonstration that such
relief was unwarranted.  Insurer submitted a response, which the court
found unpersuasive.  This appeal followed.


¶ 14.        
Insurer argues on appeal that its policy plainly bars coverage. 
According to insurer, its policy goes beyond excluding coverage for traditional
environmental risks because its definition of “pollutants” includes “that which
has been recognized in industry or government to be harmful or toxic to persons,
property or the environment.”  (Emphasis added and quotation marks
omitted.)  Insurer asserts that this language broadens the scope of the
pollution exemption beyond traditional environmental claims and distinguishes
this case from the cases relied upon by the trial court.  Insurer
maintains that it is entitled to have the policy enforced as written, that the
reasonable expectations doctrine is irrelevant given the plain language of the
policy, and that enforcement of the exclusion does not render coverage
illusory.  


¶ 15.        
We review the trial court’s decision “de novo, applying the same
standard as the trial court.”  Progressive Cas.
Ins. Co. v. MMG Ins. Co., 2014 VT 70, ¶ 10, __ Vt. __, 103 A.3d 899.
 “Summary judgment is appropriate if the material facts are undisputed and
any party is entitled to judgment as a matter of law.”  Id.; see
also V.R.C.P. 56.  


¶ 16.        
We apply well-established legal principles to this dispute.  An
insurance policy is construed according to “its terms and the evident intent of
the parties as expressed in the policy language.”  Sperling v. Allstate
Indem. Co., 2007 VT 126, ¶ 8, 182 Vt. 521, 944
A.2d 210 (quotation omitted).  We interpret policy terms “according to
their plain, ordinary and popular meaning.”  Id. (quotation
omitted).  Ambiguity exists “[i]f a term is
“subject to more than one reasonable interpretation,” and all ambiguities “must
be resolved in favor of the insured.”  Id. (quotation omitted).
 Policies that “specifically and unambiguously exclude coverage are
effective to preclude the insurer’s liability,” and “we cannot deny the insurer
the benefit of unambiguous provisions inserted into the policy for its
benefit.”  Id. ¶ 14 (quotation omitted).  While we are mindful
of “the reasonable expectations of the insured in interpreting insurance
coverage policy provisions,” “apart from circumstances where an agent of the
insurance carrier promises specific coverage, we have not held that the
expectations of an insured can control over unambiguous policy language.” 
Parsons Hill, 2010 VT 44, ¶ 28.    


¶ 17.        
We begin with the “well-documented and relatively uncontroverted” events
that led to the insurance industry’s adoption of the pollution exclusion. 
Am. States Ins. Co. v. Koloms, 687 N.E.2d 72,
79 (Ill. 1997) (quotation omitted).  “Pollution exclusions originated from
insurers’ efforts to avoid sweeping liability for long-term release of
hazardous waste.”  Quadrant, 110 P.3d at 737.  “Prior to 1966,
the standard-form CGL policy provided coverage for bodily injury or property
damage caused by an ‘accident.’ ”  Koloms,
687 N.E.2d at 79  (quotation omitted).  The term “accident” was not
defined and courts frequently interpreted the term “to encompass
pollution-related injuries.”  Id.  The insurance industry
changed to an “occurrence”-based policy, but courts continued to construe the
policies “to cover damages resulting from long-term, gradual exposure to
environmental pollution.”  Id. at 79-80.  


¶ 18.        
Meanwhile, changes in federal environmental protection laws and a series
of high-profile environmental disasters “imposed greater economic burdens on
insurance underwriters, particularly those drafting standard-form CGL
policies.”  Id.  Following these events, the insurance
industry drafted what eventually became the pollution exclusion.  Id.
at 80.


¶ 19.        
In 1970, an endorsement to the standard-form CGL policy provided in
relevant part that:  


[This
policy shall not apply to bodily injury or property damage] arising out of the
discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids,
alkalis, toxic chemicals, liquids or gases, waste materials or other irritants,
contaminants or pollutants into or upon land, the atmosphere or any watercourse
or body of water; but this exclusion does not apply if such discharge,
dispersal, release or escape is sudden and accidental.  


 


Id. (alteration in
original) (quotation omitted).  “[I]n 1973, the insurance industry
incorporated [this] endorsement directly into the body of the policy as
exclusion ‘f.’ ”  Id.  This exclusion is referred to as the
total pollution exclusion. 


¶ 20.        
Over “the next 13 years, various courts labored over the exact meaning
of the words ‘sudden and accidental.’ ”  Id.  “Not
surprisingly, insurance companies responded by drafting a new version of the
exclusion, which, first appearing in 1985, is now commonly known as the
‘absolute pollution exclusion.’ ”  Id. at 81.  As one court
explained: 


The
two most notable features of this latest version are (i)
the lack of any exception for the “sudden and accidental” release of pollution,
and (ii) the elimination of the requirement that the pollution be discharged
“into or upon land, the atmosphere or any watercourse or body of water.” 
Significantly, the purpose of the current exclusion, like its predecessor, is
“to exclude governmental clean up costs from the
scope of coverage.”  


 


Id. (alteration omitted).


¶ 21.        
Many courts have considered this historical background significant in
deciding the circumstances under which the exclusion should bar coverage. 
In Koloms, for example, the court held: 


Our
review of the history of the pollution exclusion amply demonstrates that the
predominate motivation in drafting an exclusion for pollution-related injuries
was the avoidance of the enormous expense and exposure resulting from the
explosion of environmental litigation.  Similarly, the 1986
amendment to the exclusion was wrought, not to broaden the provision’s scope
beyond its original purpose of excluding coverage for environmental pollution,
but rather to remove the sudden and accidental exception to coverage which, as
noted above, resulted in a costly onslaught of litigation.  We would be
remiss, therefore, if we were to simply look to the bare words of the
exclusion, ignore its raison d’etre, and apply it to
situations which do not remotely resemble traditional environmental
contamination.  The pollution exclusion has been, and should continue to
be, the appropriate means of avoiding the yawning extent of potential liability
arising from the gradual or repeated discharge of hazardous substances into
the environment.  


 


Id. (citation and
quotations omitted).  The Koloms court
found “it improper to extend the exclusion beyond that arena.”  Id. 
Thus, it held that the accidental release of carbon monoxide due to a broken
furnace did not constitute the type of environmental pollution contemplated by
the exclusion.  Id. at 82.


¶ 22.        
Other courts have found the historical background of this exclusion less
significant.  The Quadrant court held that it could not look to the
drafting history to find the exclusion ambiguous; the drafting history
was relevant only in determining a reasonable construction after the
court had found an ambiguity.  110 P.3d at 738, 742.  In Quadrant,
the insured sought coverage for injuries suffered by a tenant when fumes from a
waterproofing material entered the tenant’s unit.  The court concluded
that the absolute pollution exclusion “unambiguously applies to the facts of
the case at hand,” and that “the plain language must be applied without
reference to extrinsic evidence regarding the intent of the parties.”  Id.
at 735, 742.  “Where the exclusion specifically includes releases or
discharges occurring on the owner’s property,” the court continued, “or as the
result of materials brought onto the property at the behest of the insured, and
a reasonable person would recognize the offending substance as a pollutant, the
policy is subject to only one reasonable interpretation and the exclusion must
not be limited.”  Id. at 743.  


¶ 23.        
As noted, insurer here argues that its pollution exclusion is even
broader than the “absolute” or “total” pollution exclusion.  At least one
court has credited this argument.  See Cincinnati Ins. Co. v. Becker
Warehouse, Inc., 635 N.W.2d 112, 118-21 (Neb. 2001) (concluding that, where
definition of “pollutant” included substances that were “harmful or toxic to persons,
property or the environment,” the inclusion of “the environment” as a separate
entity that could suffer harm from a pollutant demonstrated that pollution
exclusion’s scope was not limited to environmental pollution); see also Clipper
Mill Fed., LLC v. Cincinnati Ins. Co., No. JFM-10-1647, 2010 WL 4117273, at
*7 (D. Md. Oct. 20, 2010) (unpub.) (reaching similar
conclusion).  But cf. Belt Painting Corp. v. TIG Ins. Co., 795
N.E.2d 15, 20-21 (N.Y. 2003) (rejecting argument that omission of requirement
that pollutants be discharged or dispersed “into or upon land, the atmosphere
or any water course or body of water” indicated intent to extend exclusion to
indoor, as well as outdoor, pollution, and explaining that omission of such
language merely removed redundancy, as “any pollution will necessarily involve
discharge or release into land, atmosphere or water” and omission of such
language did not overcome environmental implications of terms “discharge,
dispersal, seepage, migration, release or escape”).  


¶ 24.        
We recognize that courts are split on the question of whether the
absolute pollution exclusion bars coverage for all injuries caused by
pollutants or whether the exclusion applies only to injuries caused by
traditional environmental pollution.  Compare Becker Warehouse, 635
N.W.2d at 118 (recognizing split and concluding that “[a] majority of state and
federal jurisdictions have held that absolute pollution exclusions are
unambiguous as a matter of law and, thus, exclude coverage for all claims
alleging damage caused by pollutants” (citing cases)), and Quadrant, 110
P.3d at 738 (finding that “a majority of courts has concluded that absolute
pollution exclusions unambiguously exclude coverage for damages caused by the
release of toxic fumes” (citing cases)) with MacKinnon, 73 P.3d at 1209
n.2 (concluding that, “[c]onsidering those
jurisdictions that have taken a definitive position, as represented by a
published opinion of the state supreme court, the narrower interpretations of
the pollution exclusion appears to be in the majority” (citing cases)), and Midwest
Family Mut. Ins. Co. v. Wolters, 831 N.W.2d 628,
635, 635 n.2 (Minn. 2013) (concluding that “a majority of jurisdictions limit
the [pollution] exclusion to situations involving traditional environmental
pollution,” although it is a slim majority (citing cases)).  As the MacKinnon
court emphasized, and as is evident from the case law, “[t]o say that there is
a lack of unanimity as to how the clause should be interpreted is an
understatement.”  73 P.3d at 1208; see also Porterfield v. Audubon Indem. Co., 856 So. 2d 789, 800 (Ala. 2002) (“[T]here
exists not just a split of authority, but an absolute fragmentation of
authority.”).  We need not address the question of whether the “absolute
exclusion” set forth above would exclude the risk at issue here.  


¶ 25.        
The policy here excludes coverage for “[b]odily
injury . . . [that] would not have occurred in whole or in part but for the
actual, alleged or threatened discharge, dispersal, seepage, migration, release
or escape of ‘pollutants’ at any time.”  The term “pollutants” includes
gaseous irritants or contaminants, including chemicals, vapor, and fumes. 
It encompasses “that which has been recognized in industry or government to be
harmful or toxic to persons, property or the environment, regardless of whether
. . . the insured uses, generates or produces the ‘pollutant.’ ”  


¶ 26.        
The Uhlers claimed in their complaint that Ms.
Uhler suffered bodily injury after being exposed to
and encountering “airborne chemicals and airborne residue.”  They alleged
that, as part of its work at the school, Energy Wise “would be using products
and materials that were known to be severely toxic with significant risk of injury
and/or illness to humans who may be exposed to them.”  There appears to be
no dispute that the airborne chemicals and residues at issue “ha[ve] been recognized in industry or government to be harmful
or toxic to persons, property or the environment.”  Insurer cites numerous
authorities in support of this contention, and defendants do not argue
otherwise.  These toxic chemicals allegedly became airborne, and were
inhaled, as a result of Energy Wise’s application of spray-foam
insulation.  This represents a “dispersal” or “release” of such chemicals
under a common-sense reading of those terms.  See Becker Warehouse,
635 N.W.2d at 122 (similarly concluding that where fumes from floor sealant
allegedly contaminated food stored in warehouse, “the only logical explanation
for the alleged damage is that the . . . fumes ‘discharged, dispersed, released
or escaped’ ” from their original location to the place where the food was
stored).  But see Belt Painting Corp., 795 N.E.2d at 20 (reaching
opposite conclusion, and holding that terms such as “discharge” and “dispersal”
are “terms of art in environmental law used with reference to damage or injury
caused by disposal or containment of hazardous waste,” and agreeing that “it
strains the plain meaning, and obvious intent, of the language to suggest that
. . . fumes, as they went from the container to [the injured party’s] lungs,
had somehow been discharged, dispersed, released or escaped” (alteration in
original) (quotations omitted)).  


¶ 27.        
We recognize that the “broad nature of the pollution exclusion may cause
a commercial client to question the value of portions of its commercial general
liability policy.”  Becker Warehouse, 635 N.W.2d at 120.  Our
role on review, however, is not to rewrite the policy.  Where, as here,
the language used “is clear and susceptible of only one possible
interpretation,” it must be enforced as written.  Id. at 120-21;
see also Sperling, 2007 VT 126, ¶ 14 (stating that, where policy
“specifically and unambiguously exclude[s] coverage,” exclusion is “effective
to preclude the insurer’s liability” (quotation omitted)).  This
interpretation does not render the policy illusory.  As insurer points
out, the policy does provide coverage for other liability risks, such as
slip-and-fall injuries.  See also Quadrant, 110 P.3d at 744
(rejecting argument that pollution exclusion rendered CGL policy illusory,
explaining that although policy excluded from coverage some claims that would
arise out of typical type of work conducted by insured, it did not preclude
coverage for many accidents that could otherwise occur, such as slip-and-fall
injuries).  That the policy does not cover the type of claims that one
might reasonably expect to arise in the course of Energy Wise’s business does
not render the policy unenforceable.  As indicated above, an insured’s
“reasonable expectations” cannot trump “unambiguous policy language.”  Parsons
Hill, 2010 VT 44, ¶ 28; see also Wolters, 831 N.W.2d at 638-39 &
639 n.4  (reaching similar conclusion, and stating that “[t]he reasonable
expectation test is not a license to ignore the pollution exclusion . . . nor
to rewrite the exclusion solely to conform to a result that the insured might
prefer”).    


¶ 28.        
Finally, we note the limited nature of our holding.  As indicated
above, the Vermont Department of Financial Regulation requires all insurers
issuing liability policies in Vermont to provide coverage for pollution
by endorsement unless the Department approves a “Consent to Rate”
application.  Thus, our decision today applies only to surplus lines
insurers.  


Reversed and
remanded.


 




 
 

 
 
  

 

 
 
  

 

 
 
 FOR THE COURT:

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
 Associate
 Justice

 

 

 



 


 


¶ 29.        
MORRIS, Supr. J. (Ret.), Specially Assigned, dissenting.  
Energy Wise bought a general commercial liability policy for its insulation
business.  As the majority interprets the policy’s pollution exclusion,
Energy Wise essentially purchased nothing.  Under the plain-language
construction adopted by the majority, Energy Wise is not covered for any injury
or damage connected to the compounds used in its insulation business.  The
majority’s construction is not, however, the only reasonable interpretation of
the pollution exclusion.  An insured purchasing this policy could have
reasonably understood the terms “discharge” and “pollutant” in the exclusion as
limited to the mechanisms and substances involved in traditional pollution and
not excluding injury caused by ordinary negligence in the course of
business.  Given that more than one interpretation of the terms is
reasonable, the policy is ambiguous.  I would resolve this ambiguity in
favor of the insured and affirm.    


¶ 30.        
As explained by the majority, the facts are undisputed.  Defendant
Energy Wise is a company that insulates buildings.  It purchased a general
liability policy from plaintiff.  In late fall 2010, Energy Wise
contracted to install spray insulation at a Rutland-area school.  One of
the employees of the school, Shirley Uhler, alleged
she suffered respiratory illness and other medical injuries as a result of the
spray insulation.  Shirley and her husband Michael sued Energy Wise,
claiming that she was exposed to chemicals and airborne residue from the
application.  She asserted, among other things, that Energy Wise failed to
exercise due care and perform in a workmanlike manner.  Insurer filed this
suit seeking a declaration that it has no duty to defend or indemnify defendant
Energy Wise in the personal-injury suit.  


¶ 31.        
Insurer filed for summary judgment, claiming that under the plain
language of the policy’s “Total Pollution Exclusion” the alleged injury was
excluded because the policy did not provide “any coverage for bodily
injuries related to toxins, chemicals, or pollutants.”  The court
concluded that the language of the exclusion was ambiguous because the terms
pollutant and discharge were capable of such broad interpretations as to render
them meaningless.  The court further noted that the purpose of the
pollution exclusion was to protect against traditional environmental
liabilities, and not ordinary negligence.  The court resolved the
ambiguity in favor of the insured, denied insurer summary judgment, and granted
judgment for insured.


¶ 32.        
The trial court properly determined that the policy in this case is
ambiguous because the policy terms do not have a clear meaning.  Insurer
has not met its burden of demonstrating that the claims fall within the
exclusion for two main reasons.  First, it is not evident that the process
that caused the injury in this case—spraying foam insulation into a
building—resulted from one of the actions identified in the policy
exclusion—discharge, dispersal, seepage, migration, release or escape—or that
this action was the “but-for” cause of the injury.  Second, there is
insufficient evidence to show that the injury was caused by a pollutant, or
that pollutant as used in the policy covers the work performed by Energy Wise.


¶ 33.        
The legal framework is important.  Insurer sought a declaration
here that it was not obligated to indemnify or defend insured.  The duty
to indemnify arises when there is a loss or injury that falls within the
coverage provisions and is not removed from coverage by an exclusion.  Coop.
Ins. Cos. v. Woodward, 2012 VT 22, ¶ 11, 191 Vt. 348, 45 A.3d 89.  The
duty to defend is broader than the duty to indemnify.  City of
Burlington v. Nat’l Union Fire Ins. Co., 163 Vt. 124, 127, 655 A.2d 719,
721 (1994).  To determine if the duty to defend arises, the allegations in
the complaint are compared to the terms of coverage in the policy.  Id. 
“If any claims are potentially covered by the policy, the insurer has a duty to
defend.”  Id.


¶ 34.        
To determine the scope of coverage, the insurance contract is interpreted
using familiar standards.  An insurance contract is construed first by
looking to the terms used and “ ‘the evident intent of the parties as
expressed in the policy language.’ ”  N. Sec. Ins. Co. v. Perron, 172 Vt. 204, 209, 777 A.2d 151, 154 (2001)
(quoting Nat’l Union Fire Ins. Co., 163 Vt. at 127-28, 655 A.2d at
721).  The terms of a contract are given their “plain, ordinary and
popular meanings.”  Waters v. Concord Grp. Ins. Cos., 169 Vt. 534,
536, 725 A.2d 923, 926 (1999) (mem.).  An ambiguity in the policy arises
when “a writing in and of itself supports a different interpretation from that
which appears when it is read in light of the surrounding circumstances, and
both interpretations are reasonable.”  Id. at 537, 725 A.2d at 927
(quotation omitted).  The overall “guiding principle” in interpreting an
insurance contract is to consider “what a reasonably prudent person applying
for insurance coverage would have understood [the terms of the contract] to
mean.  Coop. Ins. Cos., 2012 VT 22, ¶ 9 (quotation omitted).  


¶ 35.        
Therefore, the language of the policy itself is the starting point for
determining whether coverage exists.  This was a commercial general
liability policy for the business described therein as “insulation contractors.” 
The policy covered bodily injury and property damage caused by an
occurrence.  It is clear that in the absence of an exclusion the injury
alleged by plaintiffs would have been covered under this policy.  


¶ 36.        
Thus, the main question is whether an exclusion from coverage
applies.  “The insurer bears the burden of showing that the claims are
excluded by the policy.”  Perron, 172 Vt.
at 209, 777 A.2d at 154.  Here, insurer relies on the policy exclusion
entitled “Total Pollution Exclusion Endorsement.”  The exclusion exempts
coverage for bodily injury and property damage “which would not have occurred
in whole or part but for the actual, alleged or threatened discharge,
dispersal, seepage, migration, release or escape of ‘pollutants’ at any time.” 
Pollutant is defined separately as:


any
solid, liquid, gaseous or thermal irritant or contaminant, including smoke,
vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products
and petroleum by-products, and waste.  Waste includes materials to be
recycled, reconditioned or reclaimed.  “Pollutants” include but are not
limited to, that which has been recognized in industry or government to be
harmful or toxic to persons, property or the environment, regardless of whether
the injury, damage, or contamination is caused directly or indirectly by the
“pollutants” and regardless of whether: (a) The insured is regularly or
otherwise engaged in activities which taint or degrade the environment; or (b)
The insured uses, generates or produces the “pollutant.”  


 


Thus, insurer bore the burden of
proving both that the airborne compounds and particulates from the spray-foam
insulation were pollutants when deployed to insulate the building, and that the
injury would not have occurred but for the discharge, dispersal, seepage,
migration, release or escape of those compounds.  


¶ 37.        
Of course, this question does not reach this Court in a vacuum.  As
the majority recounts, pollution exclusions have been the subject of intense litigation
for many years, and there is no consensus on the proper interpretation of these
clauses.  See MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1208
(Cal. 2003) (“To say there is a lack of unanimity as to how the clause should
be interpreted is an understatement.”).  Some of the difference in
outcomes is due to variations in fact patterns and some to changes in the
language of the pollution exclusion as it has evolved over the years.  It
began as a qualified exclusion for the “sudden and accidental” release of
pollutants.  See Pa. Nat’l Mut. Ins. Co. v.
City of Pittsburg, 987 F.2d 1516, 1518-19 (10th Cir. 1993) (analyzing
whether injury resulted from “sudden and accidental” discharge).  The next
version, referred to as the absolute pollution exclusion, eliminated the
“sudden and accidental” language and the requirement that the pollutant be
discharged into the land, atmosphere or water.  MacKinnon, 73 P.3d
at 1209-10 (describing history of pollution exclusion).  The third
generation, and the one at issue here, is referred to as the total pollution
exclusion, and excludes coverage for damage that “would not have occurred in
whole or in part but for the actual, alleged or threatened discharge,
dispersal, seepage, migration, release or escape of ‘pollutants’ at any
time.”  (Emphasis added.)  


¶ 38.        
Several courts have concluded that these exclusions, including the total
pollution exclusion, are ambiguous and do not exclude coverage for all injuries
related to toxic substances.  See, e.g., Builders Mut.
Ins. Co. v. Parallel Design & Dev. LLC, 785 F. Supp. 2d 535, 547-48
(E.D. Va. 2011) (concluding total pollution exclusion ambiguous); Kerr-McGee
Corp. v. Ga. Cas. & Sur. Co., 568 S.E.2d 484,
487 (Ga. Ct. App. 2002) (same).  Such determinations generally focus on
three things.  First, the terms “discharge, dispersal, release or escape”
all imply “expulsion of the pollutant over a considerable area rather than a
localized toxic accident occurring in the vicinity of intended use.”  MacKinnon,
73 P.3d at 1211; see 9 S. Plitt et al., Couch on
Insurance § 127:9 (3d ed. 2014) (citing cases holding that exclusion “does not
apply if the facts show that the discharge, dispersal, release, or escape was a
localized toxic accident occurring within the vicinity of the pollutant’s
intended use”).  Second, the word pollutant when defined as a contaminant
or irritant is overly broad and therefore ambiguous.  MacKinnon, 73
P.3d at 1211.  Third, the history of the exclusion reveals that it was
intended to remove coverage for traditional environmental contamination, and
not for ordinary negligence.  Id. at 1211-12.


¶ 39.        
Other jurisdictions have read the language of the pollution exclusion to
unambiguously exclude coverage.  See, e.g., Quadrant Corp. v. Am.
States Ins. Co., 110 P.3d 733, 741 (Wash. 2005) (concluding that policy
language clearly excluded coverage for injury suffered by tenant caused by
fumes from waterproofing material).  The majority takes this approach,
concluding that the exclusion here unambiguously bars coverage because the
injury resulted from exposure to a chemical and those chemicals were
airborne.  As explained more fully below, this conclusion oversimplifies
the situation.  A reasonably intelligent layperson viewing the language in
light of the usual and natural meaning of the words and the existing
circumstances could justifiably read the exclusion in this case as limiting
coverage for harm caused by traditional environmental pollution, and not
excluding coverage for injuries arising from ordinary negligence while using a
product for its intended purpose.  As applied to the facts here, the
insurer has failed to demonstrate that the exclusion applies because it fails
to show that the injury was caused by a pollutant and that the injury would not
have occurred but for the discharge of that pollutant.


I.
Discharge


¶ 40.        
Looking first to the mechanism of injury, it is totally unclear that the
injury here was due to a discharge, dispersal, seepage, migration, release or
escape of a substance.  Insurer gives little argument on this point,
stating simply in a footnote that there is no dispute that the chemicals and
residue at issue here were dispersed, released or escaped into the air. 
The majority also provides only limited consideration of this question, stating
simply that when Energy Wise applied the spray insulation, toxic chemicals
became airborne and were therefore dispersed or released “under a common-sense
reading of those terms.”  Ante, ¶ 26.  


¶ 41.        
While one reasonable interpretation of the policy is that it includes
any injury that arises when a substance becomes airborne, that is certainly not
the only interpretation.  It is important to emphasize that “ambiguity is
not what the insurer intended its words to mean but what a reasonably prudent
person applying for insurance would have understood them to mean.”  2 S. Plitt, supra, § 21:14.  It is wholly
reasonable for an ordinary person seeking coverage to interpret the terms
“discharge, dispersal, release or escape” as environmental terms of art and
referring to mechanism by which pollution escapes from a contained space into
the surrounding area.  See Mistick,
Inc. v. Nw. Nat’l Cas. Co., 2002 PA Super 267, ¶¶
9-10, 806 A.2d 39 (explaining that “dispersal” is ambiguous because it connotes
environmental context of gradual movement).  Further, it is reasonable to
conclude that these terms do not apply to injuries resulting from exposure to
an airborne irritant in the area of its intended use.  Belt Painting
Corp. v. TIG Ins. Co., 795 N.E.2d 15, 20 (N.Y. 2003) (concluding that terms
“discharge” and “dispersal” in total pollution exclusion were ambiguous and did
“not clearly and unequivocally exclude a personal injury claim arising from
indoor exposure to plaintiff insured’s tools of its trade”).  


¶ 42.        
Particularly where insurance is for a business involving the regular use
of chemical compounds, an exclusion referring to “discharge, dispersal,
seepage, migration, release or escape” is ambiguous because it does not clearly
define at what point the deployment of the chemical compound triggers the
exclusion.  As another court stated in finding this phrase ambiguous:


Industrial
chemicals when used as intended and released from a container may be used in a
production process to etch, to strip, to clean, to degrease, to polish, to act
as a solvent, to paint, to coat, to act as a mastic, or to surface.  At
what point in time does a “discharge, dispersal, seepage, migration, release or
escape” of industrial chemicals outside a container or containment system
occur?  How would containment be defined, i.e., used as intended outside a
container, contained within the plant, or merely outside
its container?  For example, carbon tetrachloride, reported in many cases
of maintenance slip and fall cases as a common industrial solvent/degreaser,
when used on the floor of a restaurant or fast food business to remove food
spills, would come within [insurer’s] overly broad exclusion language if it
caused someone to slip and fall.  This definition of the escape of
pollutants is overly broad and demonstrates ambiguity that would cause a
reasonable person to be unsure of what is excluded and what is covered by
insurance.


 


Kerr-McGee Corp., 568
S.E.2d at 459.  Given that there is no allegation in this case that the
spray-foam insulation traveled outside of the area of its intended use, there
is an ambiguity as to whether there was a “discharge, dispersal, seepage,
migration, release or escape” of this substance.


¶ 43.        
A similar conclusion was reached by the U.S. Court of Appeals for the
Sixth Circuit in a case involving a painting company that was hired to perform
construction work, including painting and drywall sealing in a school.  Meridian
Mut. Ins. Co. v. Kellman,
197 F.3d 1178 (6th Cir. 1999) (applying Michigan law).  A teacher alleged
that fumes from the chemicals in a floor sealant caused respiratory
injuries.  The insurer denied coverage under a pollution exclusion. 
The court concluded that the exclusion did not apply because the alleged injury
was confined to the general area of the intended use and therefore the injury
was not caused by the “discharge, dispersal, seepage, migration, release or
escape of pollutants.”  Id. at 1184-85 (quotation marks
omitted).  The court explained that the policy language did not “clearly
and unambiguously exclude coverage for such injuries.”  Id. at
1185.  The same is true here.  The policy terms “discharge,
dispersal, seepage, migration, release or escape” do not unambiguously apply to
the release of substances confined to the general area of their intended
use.  See Roofers’ Joint Training, Apprentice & Educ. Comm. of W.
N.Y. v. Gen. Accident Ins. Co. of Am., 713 N.Y.S.2d 615, 617 (App. Div.
2000) (holding that there was no discharge, dispersal, release, or escape of
pollutants where fumes that caused injury were part of normal roofing process
and confined to area of intended use).


¶ 44.        
Further, insurer has failed to demonstrate that even if there was a
discharge, this discharge was the “but-for” cause of the injury.  The
complaint alleges that the school employee was injured when she inhaled
chemicals or particles used in the insulation process.  Employee asserts
that her exposure was the result of Energy Wise’s negligence in failing to
perform in a workmanlike manner and to properly warn or secure the site. 
In other words, the chemicals were not the cause of injury; rather, the
“but-for” cause of the injury was the negligence of employees in failing either
to properly secure or ventilate their work area or warn employees as to when
the space was ready for occupancy.  See Barrett v. Nat’l Union Fire
Ins. Co. of Pittsburgh, 696 S.E.2d 326, 332 (Ga. Ct. App. 2010) (concluding
that pollution exclusion did not apply because allegations were that negligence
of employees caused injury and not release of gas in itself).  As the
dissenting judge in Quadrant explained, “The mere fact that a pollutant
was involved in the causal chain of events does not trigger the pollution
exclusion.”  Quadrant Corp., 110 P.3d at 745 (Chambers, J.,
dissenting).  Because the exclusion can be reasonably read to apply only
to injuries caused by a polluting event, it is ambiguous.


II. 
Pollutant


¶ 45.        
To meet its burden, insurer was also required to first show that the injury
was caused by a pollutant.  Insurer has failed to meet this burden. 
The undisputed facts as presented to the trial court at summary judgment do not
show that the chemicals or residues, which allegedly caused the injury,
unambiguously meet the policy definition of pollutant.  Further, the
definition of pollutant in the policy is so broad as to make it
ambiguous.  


¶ 46.        
Here, the policy definition of pollutant includes irritants and
contaminants that have been recognized by industry and government as harmful or
toxic.  Insurer posits that the spray-foam insulation alleged to have
caused the injury is recognized by government as potentially hazardous, and
therefore posits that the injury was unambiguously caused by a pollutant. 
The majority accepts insurer’s position and concludes that the alleged injury
was caused by the release of a pollutant because the airborne chemicals at
issue “ ‘ha[ve] been recognized in industry or
government to be harmful or toxic to persons, property or the environment.’ ” 
Ante, ¶ 26 (quoting policy definition of pollutant).  


¶ 47.        
There is no evidence in the record to show that the chemicals or
residues that caused the injury alleged are recognized by government as harmful
or toxic.  The complaint in the personal-injury action does not identify
the chemicals or residues that caused Ms. Uhler’s
injury.  Insurer’s statement of undisputed facts in support of summary
judgment did not attempt to set forth what particular compounds caused the
injury.  On appeal, insurer urges this Court to take judicial notice of
the fact that spray-foam insulation has been recognized as harmful or toxic,
and in support attaches an appendix of materials that was not part of the trial
court record.  Insurer specifically proffers that methylene diphenyl diisocyanate (MDI) is a
compound found in spray-foam insulation and is identified by government as
toxic because it is included by the Environmental Protection Agency (EPA) on
its list of hazardous air pollutants.  See 42 U.S.C. § 7412(b)(1). 
The majority does not specify what chemicals caused the injury or what industry
or government standard it is relying upon, but simply repeats that the
compounds at issue are recognized by government as toxic.  


¶ 48.        
Insurer failed to demonstrate that the injury here was caused by a
chemical that government or industry regards as toxic.  The information
submitted on appeal in support of this claim should be disregarded as not part
of the record.  See V.R.A.P. 10(a)(1) (defining record on appeal as
documents filed in superior court).  Further, even if this Court took
judicial notice of these documents, MDI, on which insurer relies, is not
identified as a component of the insulation used in this case or as a cause of
the injury.  The deposition submitted by insurer to the trial court in
support of its motion to reconsider explains that spray-foam insulation can
vary in its composition, and does not specify the composition of the insulation
used here.  In addition, to the extent that this Court accepts that MDI is
a pollutant and a component of spray-foam insulation, the Uhlers
did not allege that this was the source of the injury.  In their
opposition to summary judgment, the Uhlers stated
that the injury was due to exposure to tertiary amine catalysts, and submitted
an expert affidavit in support.  Insurer has not demonstrated this
compound is a pollutant.  Since insurer has failed to unambiguously
demonstrate that the injury alleged was caused by a pollutant, this Court
should require insurer to defend.  City of Burlington, 163 Vt. at
127, 655 A.2d at 721 (explaining that duty to defend arises if any claims
potentially covered).


¶ 49.        
Even assuming that a compound in the insulation used by Energy Wise
caused the injury and that the compound is on the EPA list of hazardous air
pollutants, these facts alone do not make it a pollutant under the policy in
all circumstances.  This may be a reasonable interpretation, but it is not
the only one.  To assume that all listed chemical compounds are pollutants
in all situations would result in overly inclusive and absurd situations since
many of the compounds on the list of hazardous air pollutants have legitimate
uses.  For example, the EPA list identified by insurer includes chlorine,
42 U.S.C. § 7412(b)(1), a chemical used to disinfect drinking water, and
found in tap water.  If inclusion on the EPA list is enough to trigger the
exclusion then any damage resulting from chlorine-treated water could be
excluded.  See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins.,
976 F.2d 1037, 1043 (7th Cir. 1992) (explaining that terms “irritant” and
“contaminant” if read broadly would exclude coverage “for bodily injuries
suffered by one who slips and falls on the spilled contents of a bottle of
Drano, and for bodily injury caused by an allergic reaction to chlorine in a
public pool” because both Drano and chlorine are irritants that can cause
bodily injury).  This is certainly not the only interpretation a
reasonably prudent person applying for insurance coverage would have understood
the terms of the contract to mean.  See Coop. Ins. Cos., 2012 VT
22, ¶ 9.    


¶ 50.        
Insurer places great emphasis on the fact the definition of pollutant in
this case differs from that used in other cases finding the language ambiguous,
such as MacKinnon, 73 P.3d 1205.  The definition of the policy here
states that pollutants are not limited to substances that are generally
recognized by industry or government to be harmful or toxic to persons,
property or the environment, and insurer argues that this shows that that the
definition is intended to include contaminants that harm persons but not the
environment.  In other words, it unambiguously applies to injuries from
toxic substances outside of traditional pollution.  Other courts
interpreting the same definition of pollutant have accepted this argument,
concluding that it expands pollutant beyond traditional environmental
pollutants.  See Clipper Mill Fed., LLC v. Cincinnati Ins. Co., No.
JFM–10–1647, 2010 WL 4117273, at *7 (D. Md. Oct. 20, 2010) (concluding that
definition of pollutant using phrase “harmful or toxic to persons, property or
the environment” demonstrated intent to include irritants and contaminants that
harm persons but not environment, and expand scope beyond environmental
pollution).  


¶ 51.        
I cannot agree with the majority that this different language of
pollutant makes the definition of pollutant unambiguous.  The definition
remains incredibly broad, applying to almost any injury involving a substance
that could be harmful.  The overly simplistic interpretation of the
pollution exclusion applied by the majority means that it excludes coverage for
ordinary negligence involving substances with toxicity.  If so
interpreted, then the exclusion has the potential to wholly eviscerate
coverage.  See Century Sur. Co. v. Casino W., Inc., 329 P.3d 614,
617 (Nev. 2014) (stating that definition of pollutant broad enough to include
“items such as soap, shampoo, rubbing alcohol, and bleach” and therefore
preclude coverage from accident caused by slipping on puddle of bleach or
developing rash from soap).  As Judge Posner explained: 


The terms
“irritant” and “contaminant,” when viewed in isolation, are virtually
boundless, for there is virtually no substance or chemical in existence that
would not irritate or damage some person or property.  Without some
limiting principle, the pollution exclusion clause would extend far beyond its
intended scope, and lead to some absurd results.


 


Pipefitters Welfare Educ. Fund,
976 F.2d at 1043 (quotation omitted).


¶ 52.        
To apply the construction used by the majority would essentially
eviscerate coverage for almost all imaginable injuries.  Insurer counters,
and the majority accepts, that the policy is not rendered illusory because it
still provides coverage for risks such as slip-and-fall injuries.  It is
hard to imagine a scenario for this insured’s business, however, that does not
involve the dispersal of pollutants as the majority and insurer defined those
terms.  What if an employee tripped while discharging the spray-foam
insulation?  Under the majority’s plain-language interpretation of
pollutant and dispersal, any resulting injuries would be excluded.  This
is certainly not what a reasonable prospective insured would assume from
reading the policy terms.


¶ 53.        
Ambiguity is also apparent when the definition of pollutant is viewed in
the context of the policy as a whole.  See McAlister v. Vt. Prop. &
Cas. Ins. Guar. Ass’n,
2006 VT 85, ¶ 17, 180 Vt. 203, 908 A.2d 455 (explaining that policy provisions
should be construed as whole and policy viewed “in its entirety”).  The
policy contains individual exclusions for bodily injury and damage resulting from
exposure to respirable dust, asbestos, lead, sulfuric
gas, tainted drywall, chromated copper arsenate
products, fluorine, beryllium, benzene, formaldehyde, and manganese.  If
the definition of pollutant is indeed as broad as insurer asserts, these additional
exclusions and lists would be redundant because they would already fall within
the pollution exclusion.  See Builders Mut.
Ins. Co., 785 F. Supp. 2d at 547-48 (concluding definition of pollutant
ambiguous in part due to terms of policy as whole).  Therefore, given the
lack of limiting language on the word pollutant and the inconsistencies that
result with other provisions in the policy, I would conclude that pollutant as
used in the exclusion is ambiguous.


III.
Resolving the Ambiguity


¶ 54.        
Generally, when an ambiguity arises, it is resolved by construing the
policy in light of the parties’ reasonable expectations, and any uncertainty is
resolved in favor of the insured.[3] 
Waters, 169 Vt. at 537, 725 A.2d at 927.  The reasonable
expectations of the parties are important in considering the scope of insurance
coverage “because such contracts, largely adhesive in nature, often contain
boilerplate terms that are not bargained for, not read, and not understood by the
insureds.”  State Farm Mut. Auto. Ins. Co. v.
Roberts, 166 Vt. 452, 461, 697 A.2d 667, 672 (1997).  


¶ 55.        
The purpose of this policy was to provide general liability insurance to
Energy Wise for the insulation business.  Undoubtedly, Energy Wise
specifically contemplated that it would be insured for using spray-foam
insulation since this is its business.  See Keggi
v. Northbrook Prop. & Cas. Ins. Co., 13 P.3d
785 (Ariz. Ct. App. 2000) (explaining that insured who purchases general
liability policy “expects to be covered for ordinary negligence in the course
of its operations”).  Given Energy Wise’s reasonable expectation that it
was purchasing a general liability policy, and the identified ambiguities in
the policy, I would construe the policy in the insured’s favor and affirm the
trial court.




 
 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
 Superior Judge (Ret.),
 Specially Assigned

 

 

 



 


 




























[1] 
Vermont law provides that insurance coverage “shall not be placed with a
non-admitted insurer unless the full amount of insurance required is not
reasonably procurable from admitted insurers actually transacting that kind and
class of insurance in [Vermont]; and the amount of insurance exported shall be
only the excess over the amount procurable from admitted insurers actually
transacting and insuring that kind and class of insurance.”  8 V.S.A. §
5024(a); see also DeBartolo v. Underwriter’s at Lloyd’s of London, 2007
VT 31, ¶ 3, 181 Vt. 609, 925 A.2d 1018 (mem.) (recognizing that a surplus lines
insurer “can issue coverage only if it is not reasonably available from other
sources”).  According to insurer, the terms of a surplus lines policy are
not subject to approval by the State of Vermont, citing 8 V.S.A. § 5021 et seq. 
Defendants do not argue otherwise.  


 


This is significant because the Vermont Department of
Financial Regulation requires all insurers issuing liability policies in
Vermont to provide coverage for pollution by endorsement, although the
Department will consider a “Consent to Rate” application “from licensed
insurance companies or their agents seeking to attach a pollution exclusion to
liability coverage when there is a high probability of a pollution
claim.”  See Insurance Bulletin No. 111 (Oct. 18, 1996), available at
http://www.dfr.vermont.gov/reg-bul-ord/pollution-coverage.  


 


Vermont regulators have disapproved of such exclusions
since their inception based on a “determination that the exclusions were
‘unfair and discriminatory to some[,] and indeed most[,] risk’ and inconsistent
with the ‘public expectation of the level of coverage or the degree of coverage
that is supposed to be available when one purchased a general liability policy.
. . .  That practice continues today, although VDBI [(now DFR)]
now has a mechanism for approving pollution exclusions on a risk-by-risk basis
in cases where, for example, the insured’s operations involve a particularly
high risk of environmental liability and the insured would otherwise be unable
to obtain coverage.”  Maska U.S., Inc.
v. Kansa Gen. Ins. Co., 198 F.3d 74, 80 (2d Cir. 1999) (alteration
omitted).


 







[2] 
While the Uhlers’ complaint did not specifically
identify the airborne substance allegedly responsible for Ms. Uhler’s injury, the Uhlers’
expert opined that it was most likely tertiary amine catalysts.  







[3] 
Here, the trial court denied summary judgment for the insurer, and entered
judgment for the insured.  I would affirm that decision.  At the very
least, however, this Court should remand for a factual inquiry into the proper
scope of the exclusion “based on the common usages and understandings of the
insurance industry, and the purposes of the exclusion in conjunction with the hazards
and risks [insurer’s] policy was designed to protect against.”  Red
Panther Chem. Co. v. Ins. Co. of Pa., 43 F.3d 514, 519 (10th Cir. 1994)
(concluding total pollution exclusion ambiguous and remanding for inquiry into
scope of policy exclusion).